## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

EDWARD QUIDERA and JEREMY CAVOLO,
individually and on behalf of all others similarly
situated,

                            Plaintiffs,

    v.

BLACKSTONE LABS, LLC,

                            Defendant.

Case No.

## CLASS ACTION COMPLAINT, DEMAND FOR JURY TRIAL, INJUNCTIVE RELIEF SOUGHT

Plaintiffs Edward Quidera and Jeremy Cavolo ("Plaintiffs") make the following

allegations pursuant to the investigation of their counsel and based upon information and belief,

except as to the allegations specifically pertaining to themselves, which are based on personal

knowledge.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action lawsuit on behalf of purchasers of Blackstone Labs, LLC's

("Defendant" or "Blackstone") Dust X and Arson supplements containing the stimulant DMHA

(collectively, "Supplements").

2.      DMHA is illegal and is not generally recognized among experts to be safe under

the conditions of its intended use.  Defendant is breaking the law by manufacturing and

distributing supplements containing the stimulant DMHA and failing to disclose that they

contain an ingredient that is illegal and not generally recognized as safe.

3.      Defendant has a long history of using illegal and unsafe ingredients in its products.  As one magazine article noted, "the company has hawked tens of millions of dollars' worth of products promising to make men stronger, bigger, last longer in the sack, and even gain a mental edge.  For the most part, their over-the-counter powders do exactly what they claim to do, in part because they sometimes include compounds not approved or even banned by the FDA."[1]

4.      Even when the FDA cracks down on the illegal substances being sold by Blackstone, it  "stay[s] ahead of the FDA simply by creating new supplements with altered formulas."[2]  That is what Blackstone did here.

5.      The Supplements were originally manufactured with an ingredient called DMAA, also a powerful, dangerous, and illegal stimulant ingredient.  Dust X evolved from a product called Dust Extreme, containing DMAA, and Arson evolved from a product called King Cobra, which also contained DMAA.

6.      But in the wake of a rash of high-profile incidents relating to DMAA use, including the death of multiple U.S. Military servicemembers, the use of DMAA in the Supplements was determined by the U.S. Food and Drug Administration and a federal court in Georgia to be illegal.  Consequently, federal authorities seized $19 million worth of DMAA from Hi-Tech Pharmaceuticals, another company owned by one of Blackstone's owners, Jared Wheat.  The court's decision regarding the illegality of DMAA was subsequently affirmed by the United States Court of Appeals for the Eleventh Circuit.  *See United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1351 (11th Cir. 2019).

---

[1] Gordy Megroz, *How Two Florida Gym Rats Conquered The Shadowy World of Dietary Supplements*, Men's Journal (March 2017).
[2] *Id.*

7.      Unable to use DMAA, Defendant has replaced it in the Supplements with a compound called "DMHA."   But, as it pertains to legality and safety, there is no difference between DMAA and DMHA.  In fact, Mr. Wheat has explained that while "DMAA is not the chemical equivalent of DMHA, it does have a very similar structure and thus, the two ingredients could be expected to produce similar effects in humans."

8.      The FDA has made its position on DMHA clear:  it is illegal.  On April 10, 2019, the FDA sent a warning letter to Mr. Wheat regarding the use of the DMHA ingredient in his products.  The warning letter states that DMHA "is not generally recognized as safe."[3]  The FDA explained that there is no evidence that "DMHA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994, nor is there information demonstrating that this ingredient has been present in the food supply as an article used for human food in a form in which the food has been chemically altered."[4]  Moreover, the FDA concluded that "dietary supplements containing DMHA as a new dietary ingredient are adulterated … because there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury."[5]

9.      Published academic literature has confirmed that the "uncontrolled use of [DMHA], its physiological and psychoactive effects raise serious health implications with possible impact on athletes and doping practices."[6]

10.      Plaintiffs and class members were never informed of any of this.  They are unsuspecting purchasers of the Supplements who were never informed that the Supplements are illegal and not generally recognized as safe.  They therefore assert claims for fraud, breach of

---

[3] The FDA's April 10, 2019 warning letter is attached hereto as **Exhibit A**.
[4] *See* Ex. A, at 2.
[5] *Id.* at 2-3.
[6] Catalani, Valeria et al. "Octodrine: New Questions and Challenges in Sport Supplements." *Brain sciences* vol. 8,2 34. 20 Feb. 2018, doi:10.3390/brainsci8020034.

warranty, and violations of the consumer protection laws of California and New York on behalf of themselves and all other similarly situated purchasers of the Supplements.

## PARTIES

11.     Plaintiff Edward Quidera is a citizen of California who resides in Twentynine Palms, California.  Mr. Quidera purchased Dust X for personal use from retailer Athlete's Nutrition in Twentynine Palms in the summer of 2018.  Mr. Quidera paid approximately $45. Mr. Quidera purchased and used Defendant's Dust X supplement based on the understanding that the supplements were lawfully sold and did not contain illegal and unsafe stimulants.  Had Defendant disclosed that the Supplements were unsafe and illegal, Mr. Quidera would have been aware of that and would not have purchased the Supplements

12.     Plaintiff Jeremy Cavolo is a citizen of New York who resides in Staten Island, New York.  Mr. Cavolo purchased the Dust X supplements for personal use online from his residence in Staten Island on several occasions for approximately $35-45.  Mr. Cavolo purchased and used Defendant's Dust X supplement based on the understanding that the supplements were lawfully sold and did not contain illegal and unsafe stimulants.  Had Defendant disclosed that the Supplements were unsafe and illegal, Mr. Cavolo would have been aware of that and would not have purchased the Supplements.

13.     Defendant Blackstone Labs, LLC is a Florida limited liability company with its principal place of business at 1120 Holland Dr., STE 14, Boca Raton, FL 33487.  Defendant distributes and sells the Supplements throughout the United States.  Defendant also affirmatively participates in the false and misleading advertising and marketing claims about the Supplements.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed

4

Class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiffs and most members of the proposed Class are citizens of states different than Defendant.

15.     This Court has personal jurisdiction over Defendant because Defendant is a resident of this District.

16.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant is a resident of this District.

### FACTS COMMON TO ALL CAUSES OF ACTION

**A.     Overview of the Supplements**

17.     Blackstone distributes and sells the Supplements, which contain the illegal ingredient and powerful stimulant DMHA.

18.     On the packaging of the Supplements, Defendant represents that each of the Supplements are a "Dietary Supplement."

19.     Each of the Supplements were originally manufactured with DMAA.  In videos on the product webpages for each of the Supplements, PJ Braun, President and CEO of Blackstone, explains that Dust X was intended to replace a former product called "Dust Extreme," and Arson was intended to replace a product called "King Cobra."  Both Dust Extreme and King Cobra contained DMAA.[7]

20.     However, after the FDA's ban on DMAA, Defendant simply reformulated the Supplements with DMHA in an attempt to stay one step ahead of the proverbial sheriff.

21.     As Mr. Braun explained, "now, with the state of the supplement industry and the FDA, we've had to remove the DMAA from our products, and we put our heads together to figure out what the next best thing was in making this product as strong as possible."

---

[7] https://blackstonelabs.com/products/dust-x and https://blackstonelabs.com/products/arson (last accessed May 29, 2020).

22.     Mr. Wheat came up with the formulation for Arson after Mr. Braun told him he "really need[ed] a replacement for King Cobra."[8]  But by Mr. Wheat's own admission, DMAA and DMHA are so similar that they are "expected to produce similar effects in humans."

23.     Nowhere in Defendant's labeling or marketing of the Supplements does Defendant disclose that the Supplements contain illegal ingredients that are not generally recognized as safe for use.  Defendant does not disclose the true nature of the Supplements to consumers.

### B.     History Of Defendant's Sales Of Illicit Substances

24.     As a result of the very competitive landscape for manufacturers of fat burning and pre-workout supplements, an increasingly widespread issue in recent years has been that certain dietary supplement manufacturers have illegally used pharmaceutical and often dangerous drugs in over-the-counter supplement products without informing consumers of the true nature of the products or the dangers associated therewith.  This is especially prevalent in the realm of stimulants, as discussed below.

25.     Blackstone did not come to sell illicit substances by happenstance.  For years, Blackstone has been at the center of the controversy as it relates to illegal stimulant ingredients.

26.     Blackstone's first product was called "Super DMZ," and it contained an illegal ingredient called "prohormones."  In 2013, the FDA forced Blackstone's Super DMZ supplier, Mira Health Products, "to recall all those pills and officially banned prohormones, including the ones in Super DMZ which Blackstone listed on the bottle."  But "[n]one of that stopped Blackstone from continuing to sell them.  In fact, at nearly the same time, the company released a new product called Metha-Quad Extreme, which contained prohormones.  It wasn't until

---

[8] *Id.*

September 2014 that Blackstone stopped selling prohormones altogether to abide by FDA regulations."[9]

27.     But that was far from the end of Blackstone's sale of illicit substances.  In April 2015, the FDA sent a warning letter to Blackstone on account of its sale of supplements containing a similar illegal stimulant called "DMBA."  *See* **Exhibit B**.  Upon receipt of this letter, Defendant immediately sold its remaining stock of DMBA products before they could be confiscated by the FDA.

28.     On February 17, 2017, the United States executed a Search and Seizure Warrant at the premises of Defendant.  The agents seized more than $1 million in illegal products, including Dust Extreme, as well as documents, and $223,430.40 in cash from Defendant on account of its illegal activities.

29.     More recently, on March 8, 2019, Defendant, as well as several of its principals, were indicted in the Southern District of Florida.  The indictment charges that the defendants conspired to defraud the government by, among other things, knowingly marketing and selling illegal substances as "dietary supplements," just as it has done with its DMHA Supplements.  A copy of the Indictment is attached hereto as **Exhibit C**.

**C.     DMHA Is An Unsafe Stimulant**

30.     Defendant markets its DMHA product to people it calls "crackies" who are seeking an "I'm cracked out type of feeling."  As Mr. Braun notes, it is a very powerful stimulant:  "As soon as you take this, you're gonna feel tingling, sweating, and if you don't go to the gym, you're probably gonna be a little shaky."[10]

---

[9] Gordy Megroz, *How Two Florida Gym Rats Conquered The Shadowy World of Dietary Supplements*, Men's Journal (March 2017).
[10] https://blackstonelabs.com/products/dust-x and https://blackstonelabs.com/products/arson (last accessed May 29, 2020).

31.     DMHA is known to be dangerous.  It has been banned by the United States Anti-Doping Agency,[11] the World Anti-Doping Agency,[12] the Department of Defense,[13] and the NCAA.[14]

32.     DMHA has also been banned in other countries.  In 2017, the Australian Therapeutic Goods Association banned DMHA "due to risks to human health."[15]

33.     DMHA can cause high blood pressure, nausea, cerebral hemorrhage, stroke, and additional side effects "such as mood swings, tremor, concentration deficiency, over-stimulation, energy crashes, anxiety, high blood pressure, dyspnea, rapid heartbeat and heartburn."[16]

34.     DMHA is not "generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures ... to be safe under the conditions of its intended use." 21 U.S.C. § 321(s).  *United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1348-1350 (11th Cir. 2019) (concluding that DMAA is not generally recognized as safe).

35.     Scholarly literature supports this conclusion as to DMHA, finding that "uncontrolled use of [DMHA], its physiological and psychoactive effects raise serious health implications with possible impact on athletes and doping practices."[17]  The study states: "[T]he lack of experimental randomized controlled trials (RCTs) and other interventional studies on humans has led to a complete absence of systematic reviews and meta-analytic studies related to

---

[11] https://www.usada.org/spirit-of-sport/education/octodrine/ (last visited 10/13/19).

[12] https://www.wada-ama.org/sites/default/files/wada_2020_english_prohibited_list_0.pdf (last visited 10/13/19).

[13] https://www.opss.org/dietary-supplement-ingredients-prohibited-department-defense (last visited 10/13/19).

[14] http://www.ncaa.org/sport-science-institute/topics/2019-20-ncaa-banned-substances (last visited 10/13/19).

[15] https://www.asada.gov.au/news/supplement-ingredients-banned (last visited 10/13/19).

[16] Catalani, Valeria et al. "Octodrine: New Questions and Challenges in Sport Supplements." *Brain sciences* vol. 8,2 34. 20 Feb. 2018, doi:10.3390/brainsci8020034

[17] Catalani, Valeria et al. "Octodrine: New Questions and Challenges in Sport Supplements." *Brain sciences* vol. 8,2 34. 20 Feb. 2018, doi:10.3390/brainsci8020034.

use of Octodrine[18] as a medicinal agent or food supplement."[19]  As such, it cannot be said that DMHA is generally recognized as safe for use as directed by Defendant.  Defendant knew as much, and intentionally failed to meet statutory requirements relevant to use of DMHA.

36.     On April 10, 2019, the FDA issued warning letters to numerous distributors of products containing DMHA, noting that those products are adulterated, as discussed below.

### D.     Defendant Broke the Law By Putting DMHA In The Supplements

37.     As distributor of the Supplements, Defendant had an affirmative duty to comply with the FDCA, as well as any parallel state statutes, including the California Sherman Law.

38.     As explained below, the inclusion of DMHA in the Supplements is illegal for two reasons.  First, because it is not properly categorized as a "dietary supplement," it is an illegal "unsafe food additive."  Second, even if it were a dietary supplement, Defendant still failed to comply with procedures required under the FDCA.

### DMHA Is An Unsafe Food Additive

39.     In 1994, the Dietary Supplement Health and Education Act ("DSHEA") was passed into law as an amendment to the FDCA, establishing a new framework governing the composition, safety, labeling, manufacturing, and marketing of dietary supplements.

40.     Dietary supplements are defined by the FDCA as a "product (other than tobacco) intended to supplement the diet" that contains one or more of the following: (1) vitamins; (2) minerals; (3) and herb or other botanical; (4) an amino acid; (5) a supplement meant to increase total dietary intake; (6) a concentrate, metabolite, constituent, extract, or combination of any of the listed ingredient.  21 U.S.C. § 321(ff)(1).

---

[18] Octodrine is another name for DMHA.
[19] *Id.*

41.     The Supplements do not meet the definition of a "Dietary Supplement" because DMHA is, in fact, a synthetically-produced "unsafe food additive."  As such, DMHA cannot be legally included in any over-the-counter supplement product, and the Supplements are adulterated.  The FDA concurred with this analysis in its April 2019 warning letter, stating: "DMHA it is not generally recognized as safe under its conditions of use in your dietary supplement products.  If DMHA is not a dietary ingredient under section 201(ff)(1) of the Act, dietary supplements containing DMHA would be adulterated under section 402(a)(2)(C)(i) of the Act because they would contain an unsafe food additive."

42.     Indeed, the Eleventh Circuit, in analyzing the closely-related DMAA against the definition of "Dietary Supplement" in the FDCA, affirmed the FDA's decision to classify DMAA as an "unsafe food additive."

43.     Like DMAA, Defendant synthetically produces DMHA for use in the Supplements.  DMHA does not meet any of the criteria to be considered a "Dietary Supplement."  Defendant misrepresents the Supplements as "Dietary Supplement[s]," when in fact they are not.  The Supplements are therefore adulterated.

**Defendant Failed To Comply With Requirements For New Dietary Ingredients**

44.     Even if the Supplements could somehow be considered "Dietary Supplements," which they cannot, they are still unlawfully sold because they are otherwise adulterated and misbranded because Defendant failed to comply with requirements for new dietary ingredients.

45.     Under the FDCA, a "New Dietary Ingredient" ("NDI") is defined as a "dietary ingredient that was not marketed in the United States before October 15, 1994 and does not include any dietary ingredient which was marketed in the United States before October 15, 1994."  21 U.S.C. § 350b(d).

46.     DMHA was not marketed in the United States before 1994 (*i.e.* before the passage of the DSHEA).  The FDA's April 2019 warning letter reached an identical conclusion.  The FDA explained that there is no evidence that "DMHA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994, nor is there information demonstrating that this ingredient has been present in the food supply as an article used for human food in a form in which the food has been chemically altered."[20]

47.     Therefore, even assuming DMHA could be considered a dietary supplement, DMHA would still be legally considered a NDI.

48.     Under the FDCA, a dietary supplement containing a NDI may only be marketed and sold if it meets one of two requirements:

> (1) The dietary supplement contains only dietary ingredients which have been present in the food supply as an article used for food in a form in which the food has not been chemically altered [or]
>
> (2) There is a history of use or other evidence of safety establishing that the dietary ingredient when used under the conditions recommended or suggested in the labeling of the dietary supplement will reasonably be expected to be safe and, at least 75 days before being introduced or delivered for introduction into interstate commerce, the manufacturer or distributor of the dietary ingredient or dietary supplement provides the FDA with information, including any citation to published articles, which is the basis on which the manufacturer or distributor has concluded that a dietary supplement containing such dietary ingredient will reasonably be expected to be safe.

21 U.S.C. § 350b(a).

49.     However, Defendant has never complied with these requirements.

50.     Defendant failed to comply with the FDA's NDI notification requirement that is mandated for all dietary supplements that contain NDIs which, like DMHA, have not been

---

[20] *See* Ex. A, at 2.

"present in the food supply as articles used for food without being chemically altered."  21 U.S.C. § 350b(a)(1).

51.     Defendant also failed to provide the FDA with the required 75-day premarket notification showing a history of DMHA's harmless use in food products/supplements or any other evidence of safety.

52.     What is more, Defendant could not have met the requirements of 21 U.S.C. § 350b(a) regardless, as there is no "history of use or other evidence of safety establishing that the dietary ingredient when used under the conditions recommended or suggested in the labeling." Indeed, the FDA explained:

> Even if a new dietary ingredient notification had been submitted under section 413(a)(2) and 21 CFR 190.6, we know of no evidence that would establish that DMHA could be lawfully marketed as a new dietary ingredient [. . . .] In the absence of a history of use or other evidence of safety establishing that DMHA [. . .] will reasonably be expected to be safe, dietary supplements containing DMHA as a new dietary ingredient are adulterated under sections 402(f) and 413(a) of the Act because there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury. Introduction of such products into interstate commerce is prohibited under sections 301(a) and (v) of the Act [21 U.S.C. § 331(a) and (v)]. To the best of FDA's knowledge, there is no history of use or other evidence of safety establishing that DMHA will reasonably be expected to be safe when used as a dietary ingredient.[21]

53.     As such, the Supplements are separately adulterated because Defendant did not follow the statutory procedure for introducing a NDI into commerce.  Defendant failed to do this because it knows that DMHA is in fact an unsafe food additive, and also knows that there is no evidence establishing the safety of DMHA when used as recommended by Defendant.

54.     In light of the foregoing, the Supplements are::

---

[21] *See* Ex. A.

- misbranded under 21 U.S.C. § 343(a);

- adulterated under 21 U.S.C. § 342(f)(1)(b);

- not legal for sale as a Dietary Supplement under 21 U.S.C. § 331(a) (because they are "adulterated" and "misbranded");

- unsafe and adulterated under 21 U.S.C. § 350(b);

- prohibited for sale under 21 U.S.C. § 331(v); and

- not legal for sale because it includes an article approved as a drug for which clinical trials have been made public under 21 U.S.C. § 331(11).

**The Supplements Violate California, New York, And Federal Law**

55.     California's Sherman Food, Drug, and Cosmetic Law expressly incorporates all food labeling requirements set forth in the FDCA (*see* Cal. H&S Code § 110100(a)), and further provides that any food is misbranded if its nutrition labeling does not conform to FDCA requirements (*see* Cal. H&S Code §§ 110665, 110670, 110673).

56.     New York has also expressly adopted the federal food labeling requirements of §343(1) and (a)(1) into state law pursuant to New York's Agriculture and Marketing law.  N.Y. Agric. & Mkts. Law § 201.

57.     New York's Agriculture and Marketing law incorporates the FDCA's labeling provisions and, likewise, provides that food shall be deemed misbranded "[i]f its labeling is false or misleading in any particular." Accordingly, a violation of federal food labeling laws is also an independent violation of New York law and actionable as such.

58.     New York law also provides remedies, including private rights of action, for misbranding food under consumer protection laws, including GBL § 349, which broadly prohibits use of "deceptive acts or practices" in business dealings in New York.

59.     Pursuant to the FDCA, and accordingly California and New York law, food products that are misbranded cannot legally be manufactured, advertised, distributed, held or sold. Because misbranded products cannot be legally sold or possessed, they have no economic or legal value. Plaintiffs and Members of the Classes who purchased the Products paid an unwarranted amount for these Products.

60.     Defendant's misleading and deceptive practices proximately caused harm to Plaintiffs and Class members. Defendants have sold Products that are worthless because they could not be lawfully sold to consumers.

**CLASS ACTION ALLEGATIONS**

61.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Supplements (the "Class").  Excluded from the Class are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

62.     Plaintiff Quidera also seeks to represent a subclass defined as all persons who purchased the Supplements in California (the "California Subclass").

63.     Plaintiff Cavolo also seeks to represent a subclass defined as all persons who purchased the Supplements in New York (the "New York Subclass").

64.     Members of the Class and the California and New York Subclasses are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and the New York and California Subclasses number in excess of tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class members and members of the California and New York Subclasses may be discerned through Defendant's records and through

14

third-party subpoenas of retailers of Defendant's products.  Class members and members of the California and New York Subclasses may be notified of the pendency of this action by mail, email, and/or publication.

65.     Common questions of law and fact exist as to all Class, California Subclass and New York Subclass members and predominate over questions affecting only individual Class and New York and California Subclass members.  These common legal and factual questions include, but are not limited to:  (a) whether Defendant's conduct violates UCC § 2-607(3)(a) concerning the breach of implied warranties; (b) whether the Supplements contain the ingredient DMHA; (c) whether the DMHA ingredient is an illegal ingredient; (d) whether Defendant was unjustly enriched by selling the Supplements to Plaintiffs and Class members; (e) whether Defendant's conduct should be enjoined; (f) whether the Supplements are adulterated due to the presence of DMHA; and (g) whether the Supplements are misbranded due to the presence of DMHA.

66.     Plaintiffs' claims are typical of the claims of the proposed Class, California Subclass, and New York Subclass in that Plaintiffs were exposed to Defendant's false and misleading marketing and promotional materials, purchased the adulterated and mislabeled Supplements, and suffered losses as a result of their purchases.  Each Class, California Subclass, and New York Subclass member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

67.     Plaintiffs are adequate representatives of the Class, California Subclass, and New York Subclass because their interests do not conflict with the interests of the Class, California Subclass and New York Subclass members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action

vigorously.  The interests of Class, California Subclass, and New York Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

68.      The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class, California Subclass, and New York Subclass members. Each individual Class member, New York Subclass member, and California Subclass member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

69.      Unless a class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiffs and the proposed Class, California Subclass, and New York Subclass members.  Unless a class-wide injunction is issued, Defendant will continue to commit the violations of law alleged, and the members of the Class, California Subclass, New York Subclass and the general public will continue to be misled.

**COUNT I**
**Breach of Implied Warranty of Merchantability**
**(On Behalf of the Nationwide Class)**

70.      Plaintiffs bring this claim individually and on behalf of the proposed Class and California and New York Subclasses.

71.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Supplements, impliedly warranted that the Supplements are merchantable as dietary supplements.

72.     The Supplements contain DMHA, which is illegal and unsafe.

73.     Defendant breached the warranty implied in the contract for the sale of the Supplements because the Supplements could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because the Supplements manufactured, distributed, and sold by Defendant contained the dangerous stimulant DMHA, which is an unsafe food additive and is otherwise illegal for sale as a dietary supplement in the United States.  As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

74.     Plaintiffs and Class members purchased the Supplements in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

75.     The Supplements were not altered by Plaintiffs or Class members.

76.     The Supplements were defective when they left the exclusive control of Defendant.

77.     Defendant knew that the Supplements would be purchased and used without additional testing by Plaintiffs and Class members.

78.     Defendant is a merchant with respect to the goods of this kind that were sold to Plaintiffs and the Class. The sale of the Supplements to Plaintiffs and Class Members contained an implied warranty that the Supplements were merchantable.

79.     However, Defendant breached that warranty implied in the contract for the sale of goods in that the Supplements are not "dietary supplements" or generally recognized as safe for use as directed by Defendant, as set forth in detail herein.

80.     As a result of Defendant's conduct, Plaintiffs and the Class did not receive goods as impliedly warranted by Defendant to be merchantable.

81.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because they would not have purchased the Supplements on the same terms if they knew that they are not generally recognized as safe and illegal.

82.     Plaintiffs and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in an amount to be determined at trial.

### COUNT II
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq.***
**(On Behalf of the California Subclass)**

83.     Plaintiff Quidera brings this claim individually and on behalf of the California Subclass.

84.     Plaintiff Quidera and the other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the Supplements for personal, family, or household purposes.

85.     Plaintiff Quidera and the other members of the California Subclass have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

86.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was

undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

87.     Defendant has violated the CLRA by marketing the Supplements as dietary supplements but failing to inform consumers that the Supplements are not, in fact, "Dietary Supplements" because they contain an unsafe food additive and a non-dietary ingredient, DMHA.  Defendant also failed to inform consumers that DMHA is not generally recognized as safe and is illegal.

88.     As a result of engaging in such conduct, Defendant has violated California Civil Code § 1770(a)(5) and (a)(7).

89.     On March 20, 2020, a CLRA demand letter was sent to Defendant via certified mail that provided notice of Defendant's violation of the CLRA and demanded that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. The letter also indicated that if Defendant refused to do so, a complaint seeking damages in accordance with the CLRA would be filed. Defendant has failed to comply with the letter. Accordingly, pursuant to California Civil Code § 1780(a)(3), Plaintiff Quidera, on behalf of himself and all other members of the California Subclass, seeks injunctive relief, compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices.  A true and correct copy of the March 20, 2020 letter is attached hereto as **Exhibit D**.

90.     A CLRA Venue Declaration is attached hereto as **Exhibit E**.

## COUNT III
### Violation of California's Unfair Competition Law ("UCL"),
### California Business & Professions Code §§ 17200, *et seq.*
### (On Behalf of the California Subclass)

91.     Plaintiff Quidera brings this claim individually and on behalf of the California Subclass.

92.     Defendant is subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 *et seq.* The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

93.     Defendant's sale of the Supplements, described herein, violated the "unlawful" prong of the UCL as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7) as alleged above.  A business act or practice is "unlawful" if it violates any established state or federal law.

94.     Defendant's sales of Supplements containing DMHA, an illegal and unsafe ingredient, constitute "unlawful" business acts and practices in that they violate the FDCA, as amended by DSHEA, and implementing regulations, including, at least, the following sections:

a.      The prohibition on introduction of adulterated dietary supplements into interstate commerce.  21 U.S.C. § 342(f)(1)(b)

b.      The prohibition on introduction of misbranded dietary supplements into interstate commerce.  21 U.S.C. §§ 331, 333; and

c.      The requirement prohibiting marketing claims that are "false or misleading in any particular." 21 U.S.C. § 343(a)(1); 21 C.F.R. § 101.93(a)(3).

95.     Each of Defendant's violations of federal law and regulations violates California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. (the "Sherman Law"), including, but not limited to, the following sections:

a.     Section 110100 (adopting all FDA regulations as state regulations);

b.     Section 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account.");

c.     Section 110390 ("It is unlawful for any person to disseminate any false advertisement of any food. . . . An advertisement is false if it is false or misleading in any particular.");

d.     Section 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

e.     Section 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

f.     Section 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . ."); and

g.     Section 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.").

96.     Each of the challenged omissions, statements, and actions by Defendant violates the FDCA, as amended by DSHEA, and the Sherman Law, and, consequently, violates the "unlawful" prong of the UCL.

97.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that Defendant's conduct is substantially injurious to consumers,

offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits.

98.     Defendant's conduct, described herein, violated the "fraudulent" prong of the UCL by making the omissions concerning the legality of the Supplements.

99.     Defendant leveraged its omissions (in failing to inform consumers that the Supplements contained an illegal and unsafe ingredient) and deception to induce Plaintiff Quidera and the members of the California Subclass to purchase the Supplements, which were of different characteristics, value, and/or quality than advertised.

100.    Defendant's unlawful sales and deceptive marketing and labeling caused Plaintiff Quidera and the members of the California Subclass to suffer injury in fact and to lose money or property, as it denied them the benefit of the bargain.  Had Plaintiff Quidera and the members of the California Subclass been aware of Defendant's unlawful marketing, labeling, and/or sales tactics, they would not have purchased Defendant's Supplements.

101.    Plaintiff Quidera also seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to immediately cease distribution and sale of the Supplements.

102.    Plaintiff Quidera also seeks an order for the disgorgement and restitution of all monies from the sale of the Supplements unjustly acquired through acts of unlawful, unfair, and/or fraudulent competition.

**<u>COUNT IV</u>**
**Violation of New York General Business Law § 349**
**(On Behalf of the New York Subclass)**

103.    Plaintiff Cavolo brings this claim individually and on behalf of the New York Subclass.

104.     By marketing and distributing the Supplements as "dietary supplements" and

failing to inform consumers that they contained an illegal and unsafe ingredient, Defendant

engaged in deceptive acts and practices by falsely and misleadingly marketing its Supplements to

consumers.

105.     The foregoing deceptive acts and practices were directed at consumers.

106.     The foregoing deceptive acts and practices are misleading in a material way

because had the omitted information been disclosed, Plaintiffs and New York Subclass Members

would have been aware of it and not purchased the Supplements.

107.     Plaintiffs and members of the New York Subclass were injured because they

would not have purchased the Supplements had they known that they contained an illegal and

unsafe ingredient.  As a result of Defendant's misrepresentations and omissions, Plaintiffs and

members of the New York Subclass have been damaged because they paid a premium to

purchase the Supplements.  Specifically, Plaintiffs and members of the New York Subclass were

damaged in the full amount of the purchase price of the Supplements because the Supplements

were worthless due to their illegality and inherent danger.

108.     By advertising, marketing, distributing, and/or selling the Supplements to

Plaintiffs and the other members of the New York Subclass, Defendant engaged in and continues

to engage in deceptive acts, practices, and omissions.

109.     Plaintiffs and the other members of the New York Subclass further seek to enjoin

such unlawful deceptive acts and practices as described above. Each of the New York Subclass

members will be irreparably harmed unless Defendant's unlawful actions are enjoined.

Specifically, Defendant will continue to falsely and misleadingly sell the Supplements without

disclosing their true nature, as set forth at length above.  Absent injunctive relief, Defendant will

continue to manufacture and sell its Supplements without disclosing that they are illegal and not generally recognized as safe.

110.     On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT V**
**Fraud**
**(On Behalf of the Nationwide Class)**

111.     Plaintiffs bring this claim individually and on behalf of the members of the Class and California and New York Subclasses against Defendant.

112.     Defendant failed to disclose to Class members the true nature of, illegality of, and danger associated with, DMHA.  Indeed, Defendant markets the Supplements as "Dietary Supplement[s]," which is a uniform representation on the label of each one of the Supplements. However, in truth, Defendant knows that DMHA is not a "Dietary Supplement", but is in fact a synthetically-produced "unsafe food additive."  Defendant further knows that even if DMHA could be considered a "Dietary Supplement", which it cannot, the Supplements are still adulterated because there is no evidence suggesting that DMHA, a NDI, is safe for use as directed by Defendant.

113.     Defendant knew about the dangers associated with DMHA, and intentionally failed to comply with the FDCA and supporting regulations in establishing the safety and efficacy of DMHA as directed on the label.  Defendant intentionally failed to meet these obligations because it knows no such evidence exists, and it knows that DMHA is in fact an illegal stimulant and an unsafe food additive.

114.    Defendant knew that DMHA carries the same risks and dangers of the previously banned ingredient DMAA, but included DMHA in its products nonetheless.

115.    Plaintiffs each purchased the Supplements containing the unlawful ingredient DMHA.  In purchasing the Supplements, Plaintiffs each reviewed the labels and disclosures, including Defendant's claim that the Supplements were "Dietary Supplement[s]."  Plaintiffs relied on Defendant's representations, including that the Supplements were "Dietary Supplement[s]," to their detriment.  Had they known the truth about the Supplements, they would not have purchased or used the products.

116.    The false and misleading omissions were made with knowledge of their falsehood.

117.     The false and misleading representations and omissions were made by Defendant, upon which Plaintiffs and members of the Class and California and New York Subclasses reasonably and justifiably relied and were intended to induce and actually induced Plaintiffs and Class members to purchase the Supplements.

118.    The fraudulent actions of Defendant caused damage to Plaintiffs and members of the Class, who are entitled to damages and other legal and equitable relief as a result.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

119.    Plaintiffs bring this claim individually and on behalf of the members of the Class and California and New York Subclasses against Defendant.

120.    As a result of Defendant's unlawful and misleading labeling, marketing, and sale of the Supplements, Defendant was enriched at the expense of Plaintiffs.

121.    Defendant has knowledge of these benefits.

122.    The Supplements contain DMHA, an illegal and unsafe ingredient.

123.     Defendant sold the Supplements to Plaintiffs despite the fact that they were not capable of being sold legally and were worthless.

124.     It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiffs and Class members given that the Supplements were not what Defendant purported them to be.

125.     It would be unjust and inequitable for Defendant to retain the benefit, warranting restitutionary disgorgement to Plaintiffs and Class members of all monies paid for the Supplements, and/or all monies paid for which Plaintiffs and Class members did not receive benefit.

126.     As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Class and California and New York Subclasses, that the Court enter judgment in their favor and against Defendant as follows:

A.     An Order certifying the proposed Class and California and New York Subclasses and appointing Plaintiffs and their Counsel to represent the Class and California and New York Subclasses;

B.     An Order enjoining Defendant from engaging in the wrongful conduct alleged herein concerning the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices;

C.     An Order of disgorgement of wrongfully obtained profits;

D.     An award of compensatory, statutory, and punitive damages, in an amount to be determined;

E.      An award of reasonable attorneys' fees costs and litigation expenses, as allowable

by law;

F.      Interest on all amounts awarded, as allowed by law; and

G.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  June 3, 2020                                    Respectfully submitted,

                                                        **BURSOR & FISHER, P.A.**

                                                        By:  _/s/ Sarah N. Westcot_
                                                             Sarah N. Westcot

                                                        Scott A. Bursor
                                                        Sarah N. Westcot
                                                        701 Brickell Ave., Ste. 1420
                                                        Miami, FL  33131
                                                        Telephone: (305) 330-5512
                                                        Facsimile: (212) 989-9163
                                                        Email: scott@bursor.com
                                                                swestcot@bursor.com

                                                        **BURSOR & FISHER, P.A.**
                                                        Yitzchak Kopel (*pro hac* forthcoming)
                                                        888 7th Avenue
                                                        New York, NY 10019
                                                        Telephone: (646) 837-7126
                                                        Facsimile: (212) 989-9163
                                                        Email: ykopel@bursor.com

                                                        *Attorneys for Plaintiffs*

**EXHIBIT A**

WARNING LETTER

# Hi Tech Pharmaceuticals

### MARCS-CMS 560788 — APRIL 10, 2019

**Product:**

Dietary Supplements

---

**Recipient:**

Jared Wheat

CEO & Founder

Hi Tech Pharmaceuticals

6015 B Unity Drive

Norcross, GA 30071-3575
United States

**Issuing Office:**

Center for Food Safety and Applied Nutrition

5001 Campus Drive

College Park, MD 20740-3835
United States

---

**WARNING LETTER**

**VIA OVERNIGHT DELIVERY**

**RETURN RECEIPT REQUESTED**

April 10, 2019

Jared Wheat, CEO & Founder

Hi-Tech Pharmaceuticals, Inc.

6015 B Unity Drive

Norcross, GA 30071-3575 US

Re: 560788

Dear Mr. Wheat:

This letter concerns your products Ultimate Orange, HydroxyElite, Lipodrene Elite, and Synadrene, which are labeled and/or offered for sale as dietary supplements. The Supplement Facts panel on your product labels declares 2-Aminoisoheptane HCl as a dietary ingredient. This ingredient is also called, among other names, 1,5-DMHA, 2-amino-6-methylheptane, 2-amino-5methylheptane, 1,5-Dimethylhexylamine, 2-Isooctyl amine, and Octodrine, and will be referred to hereinafter as DMHA.

The term "dietary supplement" is defined in section 201(ff) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 321(ff)]. Given that you have declared DMHA as a dietary ingredient in the labeling of your product, we assume you have a basis to conclude that DMHA is a "dietary ingredient" under section 201(ff)(1) of the Act [21 U.S.C. § 321(ff)(1)]. If you have a basis to conclude that DMHA is a "dietary ingredient," it would also be a "new dietary ingredient" (i.e., a dietary ingredient not marketed in the United States before October 15, 1994) under section 413(d) of the Act [21 U.S.C. § 350b(d)].

Under section 413 of the Act [21 U.S.C. § 350b], a dietary supplement that contains a new dietary ingredient shall be deemed adulterated under section 402(f) of the Act [21 U.S.C. § 342(f)] unless it meets one of two requirements:

1.      The dietary supplement contains only dietary ingredients that have been present in the food supply as an article used for food in a form in which the food has not been chemically altered; or

2.      There is a history of use or other evidence of safety establishing that the dietary ingredient when used under the conditions recommended or suggested in the labeling of the dietary supplement will reasonably be expected to be safe and, at least 75 days before being introduced or delivered for introduction into interstate commerce, the manufacturer or distributor of the dietary ingredient or dietary supplement provides FDA with information, including any citation to published articles, which is the basis on which the manufacturer or distributor has concluded that a dietary supplement containing such dietary ingredient will reasonably be expected to be safe.

To the best of FDA's knowledge, there is no information demonstrating that DMHA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994, nor is there information demonstrating that this ingredient has been present in the food supply as an article used for human food in a form in which the food has not been chemically altered.  Assuming DMHA is a dietary ingredient, in the absence of such information, DMHA would be subject to the notification requirement in section 413(a)(2) of the Act [21 U.S.C. § 350b(a)(2)] and 21 CFR 190.6. Products for which the manufacturer or distributor is required to submit a new dietary ingredient notification under section 413(a)(2) and 21 CFR 190.6, but for which the required notification has not been submitted, are adulterated under sections 402(f) and 413(a) of the Act [21 U.S.C. §§ 342(f) and 350b(a)].

Even if a new dietary ingredient notification had been submitted under section 413(a)(2) and 21 CFR 190.6, we know of no evidence that would establish that DMHA could be lawfully marketed as a new dietary ingredient in your Ultimate Orange, HydroxyElite, Lipodrene Elite, and Synadrene products. In the absence of a history of use or other evidence of safety establishing that DMHA, when used under the conditions recommended or suggested in the labeling as a dietary ingredient, will reasonably be expected to be safe, dietary supplements containing DMHA as a new dietary ingredient are adulterated under sections 402(f) and 413(a) of the Act because there is inadequate information to provide reasonable assurance that such ingredient does not present

a significant or unreasonable risk of illness or injury. Introduction of such products into interstate commerce is prohibited under sections 301(a) and (v) of the Act [21 U.S.C. § 331(a) and (v)]. To the best of FDA's knowledge, there is no history of use or other evidence of safety establishing that DMHA will reasonably be expected to be safe when used as a dietary ingredient.

We also note that we have questions about whether DMHA is, in fact, a dietary ingredient. If DMHA were not a dietary ingredient under section 201(ff)(1) of the Act, it would be an unsafe food additive.  If a substance is not generally recognized as safe (GRAS) by qualified experts for its intended use in food and does not qualify for any of the other exemptions from the food additive definition, it is a food additive.[1] Food additives require premarket approval based on data demonstrating safety.  Any food additive that has not been approved for its intended use in food is deemed to be unsafe and causes the food to be adulterated under section 402(a)(2)(C)(i) of the Act [21 U.S.C. § 342(a)(C)(i)]. Adulterated foods cannot be legally imported or marketed in the United States.

Section 201(s) of the Act [21 U.S.C § 321(s)] exempts dietary ingredients used in dietary supplements from the food additive definition.  However, non-dietary ingredients intended for use in dietary supplements are not exempt from the food additive definition and must meet the same requirements as substances added to conventional foods.  In other words, a non-dietary ingredient added to a dietary supplement must be used in accordance with a food additive regulation or be GRAS for its intended use, unless it qualifies for another exception to the food additive definition.

DMHA it is not generally recognized as safe under its conditions of use in your dietary supplement products.  If DMHA is not a dietary ingredient under section 201(ff)(1) of the Act, dietary supplements containing DMHA would be adulterated under section 402(a)(2)(C)(i) of the Act because they would contain an unsafe food additive.

The violations cited in this letter are not intended to be an all-inclusive statement of violations that exist in connection with your products.  You are responsible for investigating and determining the causes of the violations identified above and for preventing their recurrence or the occurrence of other violations.  It is your responsibility to ensure that your firm complies with all requirements of federal law, including FDA regulations.

You should take prompt action to correct the violations addressed in this letter, as well as any other violations associated with your Ultimate Orange, HydroxyElite, Lipodrene Elite, and Synadrene products or other dietary supplement products marketed by your firm, including any that contain DMHA. We also remind you that the new dietary ingredient notification requirement applies to all dietary supplements that contain new dietary ingredients that have not been present in the food supply as articles used for food in a form in which the food has not been chemically altered. Failure to immediately cease distribution of your products Ultimate Orange, HydroxyElite, Lipodrene Elite, and Synadrene, and any other products you market that contain DMHA, could result in enforcement action by FDA without further notice. Sections 302 and 304 of the Act provide for seizure of violative products and injunction against the manufacturers and distributors of violative products [21 U.S.C. §§ 332 and 334].

Within fifteen working days of receipt of this letter, please notify this office in writing of the specific steps that you have taken to correct these violations. Include an explanation of each step being taken to prevent the recurrence of violations, as well as copies of related documentation. If you believe that your products are not in

violation of the Act, include your reasoning and any supporting information for our consideration. If you cannot complete corrective action within fifteen working days, state the reason for the delay and the time within which you will complete the correction.

Your written reply should be directed to Mr. Rob Genzel Jr., Compliance Officer, United States Food and Drug Administration, Center for Food Safety and Applied Nutrition, 5100 Paint Branch Parkway, Office of Compliance (HFS-608), Division of Enforcement, College Park, Maryland 20740-3835. If you have any questions, you may also contact Mr. Genzel at rob.genzel@fda.hhs.gov (mailto:rob.genzel@fda.hhs.gov).

Sincerely,

/S/

William A. Correll

Director

Office of Compliance

Center for Food Safety and Applied Nutrition

---

[1] Under section 201(s) of the Act [21 U.S.C. § 321(s)], the following types of substances are excluded from the food additive definition: (1) pesticide chemical residues in or on a raw agricultural commodity or processed food; (2) pesticide chemicals; (3) color additives; (4) substances used in accordance with a "prior sanction" (i.e., a sanction or approval granted prior to the enactment of the Food Additives Amendment of 1958 under the Act, the Poultry Products Inspection Act, or the Meat Inspection Act); (5) new animal drugs; and (6) dietary ingredients in or intended for use in a dietary supplement.

⊖ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

**EXHIBIT B**

WARNING LETTER

# Blackstone Labs LLC

**APRIL 24, 2015**

**Recipient:**

Blackstone Labs LLC

United States

**Issuing Office:**

Center for Food Safety and Applied Nutrition

United States

 **Department of Health and Human Services**

Public Health Service
Food and Drug Administration

5100 Paint Branch Parkway
College Park, MD 20740

**WARNING LETTER**

VIA OVERNIGHT DELIVERY
RETURN RECEIPT REQUESTED

APR 24 2015

Aaron Singerman
Blackstone Labs, LLC
9605 Parkview Avenue
Boca Raton, FL 33428

Re: 447355

Dear Mr. Singerman:

This letter concerns your product Angel Dust, which is labeled and/or offered for sale as a dietary supplement. The Supplement Facts panel on your product label declares AMP Citrate (4-amino-2-methylpentane citrate) as a dietary ingredient. This ingredient is also called, among other names, 1,3-Dimethylbutylamine, DMBA, 2-amino-4-methylpentane, and 4-methyl-2-pentanamine, and will be referred to in the rest of this letter as DMBA.

The term "dietary supplement" is defined in section 201(ff) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 321(ff)). Given that you have declared DMBA as a dietary ingredient in the labeling of your product, we assume you have a basis to conclude that DMBA is a "dietary ingredient" under section 201(ff)(1) of the Act (21 U.S.C. 321(ff)(1)). Assuming that DMBA is a "dietary ingredient," it would also be a "new dietary ingredient" for which a notification is required under section 413(a)(2) of the Act (21 U.S.C. 350b(a)(2)) and 21 CFR 190.6.

Under section 413 of the Act (21 U.S.C. 350b), a dietary supplement that contains a new dietary ingredient (i.e., a dietary ingredient not marketed in the United States before October 15, 1994) shall be deemed adulterated under section 402(f) of the Act (21 U.S.C. 342(f)) unless it meets one of two requirements:

1. The dietary supplement contains only dietary ingredients that have been present in the food supply as an article used for food in a form in which the food has not been chemically altered; or
2. There is a history of use or other evidence of safety establishing that the dietary ingredient when used under the conditions recommended or suggested in the labeling of the dietary supplement will reasonably be expected to be safe and, at least 75 days before being introduced or delivered for introduction into interstate commerce, the manufacturer or distributor of the dietary ingredient or dietary supplement provides FDA with information, including any citation to published articles, which is the basis on which the manufacturer or distributor has concluded that a dietary supplement containing such dietary ingredient will reasonably be expected to be safe.

To the best of FDA's knowledge, there is no information demonstrating that DMBA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994, nor is there information demonstrating that this ingredient has been present in the food supply as an article used for human food in a form in which the food has not been chemically altered. In the absence of such information, DMBA is subject to the notification requirement in section 413(a)(2) of the Act (21 U.S.C. 350b(a)(2)) and 21 CFR 190.6. Because the required notification has not been submitted, your product is adulterated under sections 402(f)(1)(B) and 413(a) of the Act (21 U.S.C. 342(f)(1)(B) and 350b(a)).

Even if the required notification had been submitted, we know of no evidence that would establish that your product is not adulterated. In the absence of a history of use or other evidence of safety establishing that DMBA, when used under the conditions recommended or suggested in the labeling of your product, will reasonably be expected to be safe, Angel Dust is adulterated under sections 402(f)(1)(B) and 413(a) of the Act (21 U.S.C. 342(f)(1)(B) and 350b(a)) because it contains a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury. Introduction of such a product into interstate commerce is prohibited under sections 301(a) and (v) of the Act (21 U.S.C. 331(a) and (v)). To the best of FDA's knowledge, there is no history of use or other evidence of safety establishing that DMBA will reasonably be expected to be safe when used as a dietary ingredient.

It has come to our attention that DMBA used in products in the dietary supplement marketplace may be produced synthetically. Section 201(ff)(1) of the Act (21 U.S.C. 321(ff)(1)) defines "dietary ingredient" as a vitamin, mineral, amino acid, herb or other botanical, or dietary substance for use by man to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract or combination of any dietary ingredient from the preceding categories. Synthetically produced DMBA is not a vitamin, mineral, amino acid, herb or other botanical. To the best of FDA's knowledge, synthetically produced DMBA is not commonly used as human food or drink. Further, synthetically produced DMBA is not a concentrate, metabolite, constituent, extract or combination of the preceding categories. Therefore, synthetically produced DMBA is not a dietary ingredient as defined in section 201(ff)(1) of the Act.

We request that you take prompt action to correct the violations cited above, as well as any other violations associated with your Angel Dust product or other dietary supplement products marketed by your firm, including any that contain DMBA. We also remind you that the new dietary ingredient notification requirement applies to all dietary supplements that contain new dietary ingredients that have not been present in the food supply as articles used for food in a form in which the food has not been chemically altered. It is your responsibility to ensure that your firm complies with all requirements of federal law and FDA regulations.

Failure to immediately cease distribution of your product Angel Dust and any other products you market that contain DMBA could result in enforcement action by FDA without further notice. Sections 302 and 304 of the Act provide for seizure of violative products and injunction against the manufacturers and distributors of violative products [21 U.S.C. §§ 332 and 334].

We request that you advise us in writing, within 15 days of receipt of this letter, as to the specific steps that have been or will be taken to correct these violations, including any steps taken with respect to product currently in the marketplace. Your response should also include an explanation of each step taken to ensure that similar violations do not recur, as well as documentation to support your response. Your written reply should be directed to Mr. Shawn Goldman, United States Food and Drug Administration, Center for Food Safety and Applied Nutrition, 5100 Paint Branch Parkway, Office of Compliance (HFS-608), Division of Enforcement, College Park, Maryland 20740-3835. If you have any questions, please contact Mr. Goldman at shawn.goldman@fda.hhs.gov (mailto:shawn.goldman@fda.hhs.gov).

Sincerely,
/s/
William A. Correll

Director
Office of Compliance
Center for Food Safety and Applied Nutrition

◉ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

**EXHIBIT C**

Case 9:19-cv-80030-WPD Document 1 Entered on FLSD Docket 06/04/2019 Page 1 of 38 D.C.

Case 9:19-cv-80030-WPD Document 1 Entered on FLSD Docket 03/08/2019 Page 1 of 38

FILED BY _____ D.C.

MAR 0 7 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. **19-80030-CR-DIMITROULEAS/MATTHEWMAN**

18 U.S.C. § 371
21 U.S.C. §§ 331(d), 355(a), 333(a)(2)
21 U.S.C. § 846
21 U.S.C. § 841
18 U.S.C. § 1957
18 U.S.C. §§ 981, 982
21 U.S.C. § 853

UNITED STATES OF AMERICA

vs.

PHILLIP BRAUN,
    a/k/a "PJ,"
AARON SINGERMAN,
ROBERT DIMAGGIO,
ANTHONY VENTRELLA,
    a/k/a "Joey,"
JAMES BOCCUZZI,
DAVID WINSAUER,
BLACKSTONE LABS, LLC, and
VENTECH LABS, LLC,

          Defendants.
                          /

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

## Food, Drugs, and Dietary Supplements Under the Food, Drug, and Cosmetic Act

1.    The Food and Drug Administration (FDA) was the agency of the United States

responsible for, among other things, enforcing the provisions of the Federal Food, Drug, and

Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.* FDA's primary purpose in enforcing the FDCA was to protect the health and safety of consumers in the United States. FDA's responsibilities included regulating the manufacturing, labeling, and distribution of food and drugs shipped or received in interstate commerce. FDA's responsibilities included preventing improperly packaged or labeled food and drugs not approved for sale from reaching consumers.

2.      It was unlawful under the FDCA to distribute in interstate commerce any new drug that had not been approved by the FDA.

3.      Purchasers of food and dietary supplements outside the United States often required sellers to certify that products were legal in the United States. Any person who exported a food, including a dietary supplement, from the United States could request that FDA certify in writing that the product meets certain requirements of the FDCA. The certification was known as a "Certificate of Free Sale."

### Prohormones, SARMs and Other Compounds

4.      Designer steroids were synthetic steroid compounds derived by simple chemical modification from another steroid, usually an anabolic steroid. Some designer steroids were referred to as "prohormones."

5.      Dimethazine, methylstenbolone and methyl-1-etiocholenolol were synthetic steroids and were often referred to as "prohormones." They were not dietary ingredients that could be used in dietary supplements.

6.      Selective Androgen Receptor Modulators (SARMs) were chemical substances about which there were serious safety concerns, including that they increased the risk of heart attack, stroke, and liver damage.

2

7.      Ostarine was a SARM and had been authorized by FDA to be investigated as a new drug.  Since in or around 2008, clinical research studies of ostarine have been conducted and publicized.

8.       "Nootropic" substances were chemical substances marketed to be consumed as mind-altering or cognition-enhancing products.

9.      Picamilon, also known as "pikatropin," was a synthetic chemical compound. Picamilon has been marketed as a nootropic compound and sold as an antidepressant.  Picamilon was not a dietary ingredient.

## Corporate Defendants

10.     Defendant **BLACKSTONE LABS, LLC (BLACKSTONE)** was a limited liability company that was incorporated under the laws of the State of Florida on or about August 29, 2012. **BLACKSTONE** was located in Palm Beach County, Florida, and engaged in the sale and distribution of products that they claimed were dietary supplements.

11.     Defendant **VENTECH LABS, LLC (VENTECH)** was a limited liability company that was established under the laws of the State of Florida on or about June 13, 2016. **VENTECH** was located in Palm Beach County, Florida.  **VENTECH** manufactured and sold products that it claimed were dietary supplements to consumers throughout the United States.   **VENTECH** also manufactured products for **BLACKSTONE.**

## Individual Defendants

12.     Defendant **PHILLIP BRAUN, a/k/a "PJ,"** resided in Palm Beach County, Florida. **BRAUN** co-founded **BLACKSTONE** and was president until May 2016, when he also became **BLACKSTONE's** chief executive officer.  **BRAUN** was an owner of **BLACKSTONE.**

3

13.     Defendant **AARON SINGERMAN** resided in Palm Beach County, Florida. **SINGERMAN** co-founded **BLACKSTONE** and was chief executive officer until May 2016. He was an owner of the company until in or around January 2018.

14.     Defendant **ROBERT DIMAGGIO** resided in Henderson, Nevada. **DIMAGGIO** co-founded **BLACKSTONE** with **PHILLIP BRAUN** and **AARON SINGERMAN**.

15.     Defendant **ANTHONY VENTRELLA, a/k/a "Joey,"** resided in St. Francisville, Louisiana, and Palm Beach County, Florida. **VENTRELLA** was an owner and chief executive officer of **VENTECH**.

16.     Defendant **JAMES BOCCUZZI** resided in the State of Connecticut and in Broward and Palm Beach Counties, Florida. **BOCCUZZI** was **BLACKSTONE's** lead salesman and managed wholesale sales.

17.     Defendant **DAVID WINSAUER** resided in Palm Beach County, Florida. **WINSAUER** worked as **BLACKSTONE's** vice president, and managed the company's marketing, its website, and its direct-to-consumer sales.

### Unindicted Co-Conspirators

18.     Unindicted Co-conspirator 1 was an owner and manager of Fight Pharm, LLC, a supplement manufacturing company in Palm Beach County, Florida, and an owner and manager of a business in the State of Georgia that manufactured products for **BLACKSTONE**.

19.     Unindicted Co-conspirator 2 was an owner and manager of **VENTECH** and along with **ANTHONY VENTRELLA** controlled the company's important activities. Unindicted Co-Conspirator 2 also assisted **VENTRELLA** in running the day-to-day operations of Fight Pharm, LLC and VBS Laboratories, LLC, another supplement manufacturing company in Palm Beach County, Florida.

4

20.     Unindicted Co-conspirator 3 was the owner and chief executive of a supplement retailer in Batesville, Arkansas, who repeatedly purchased products from **BLACKSTONE**.

21.     Unindicted Co-conspirator 4 worked as **BLACKSTONE's** manager of inventory and shipping, and later as its chief operations officer.

### Defendants' Business Practices

22.     Beginning on or about July 2, 2013, **ROBERT DIMAGGIO**, an associate of **PHILLIP BRAUN** and **AARON SINGERMAN**, helped start **BLACKSTONE** and became a manager of the company.  As a result of his work with **BRAUN** and **SINGERMAN, DIMAGGIO** received monthly payments of $6,000 from **BLACKSTONE** until in or around September 2017.

23.     Until in or around April 2016, **PHILLIP BRAUN** and **AARON SINGERMAN** jointly owned and controlled **BLACKSTONE.**  In or around April 2016, disputes arose between **BRAUN** and **SINGERMAN** and led to **SINGERMAN's** departure from on-site, day-to-day operation and control of **BLACKSTONE. SINGERMAN** remained a part-owner of **BLACKSTONE** and continued to receive a portion of its profits until in or around January 2018. After **SINGERMAN's** departure from on-site participation and control, **BRAUN** became the dominant owner, controlling **BLACKSTONE's** important activities, including its day-to-day operations and finances.

24.     **AARON SINGERMAN, PHILLIP BRAUN,** and Unindicted Co-conspirator 1 established Fight Pharm, LLC (Fight Pharm) as a limited liability company under the laws of the State of Florida on or about April 16, 2014.  Fight Pharm manufactured and sold drugs purportedly marketed as dietary supplements to customers throughout the United States.

5

25.     **AARON SINGERMAN** and **PHILLIP BRAUN** established Fight Pharm so that they could shift the sale of drugs and other products from **BLACKSTONE** to Fight Pharm and to hide such sales from FDA.

26.     **AARON SINGERMAN** and **PHILLIP BRAUN** directed **ANTHONY VENTRELLA** to be the nominal owner and chief executive officer of Fight Pharm. **VENTRELLA** and Unindicted Co-conspirator 2 ran the day-to-day operations of the company. **SINGERMAN** and **BRAUN** had signature authority over Fight Pharm's bank accounts and received the company's profits.  One of Fight Pharm's largest customers was **BLACKSTONE**. Fight Pharm became largely inactive by 2016 and was dissolved under Florida law on or about August 17, 2017.

27.     **AARON SINGERMAN, PHILLIP BRAUN**, and **ANTHONY VENTRELLA** established VBS Laboratories, LLC (VBS) as a limited liability company under the laws of the State of Florida on or around November 6, 2015.  VBS, which operated in Palm Beach County, Florida, manufactured and sold drugs throughout the United States purportedly marketed as dietary supplements.

28.     **AARON SINGERMAN** and **PHILLIP BRAUN** established VBS as a successor to Fight Pharm operating at the same location as Fight Pharm and acquiring Fight Pharm's manufacturing equipment.   VBS became active in 2016, after Fight Pharm became inactive. **ANTHONY VENTRELLA** was a co-owner of VBS with **SINGERMAN** and **BRAUN**. **VENTRELLA** and Unindicted Co-conspirator 2 ran VBS's day-to-day operations. **BLACKSTONE** was one of VBS's largest customers.  **SINGERMAN** and **BRAUN** received profits from VBS.  VBS was dissolved under Florida law on or about August 17, 2017.

6

29.     **VENTECH** was a successor to VBS, operating at VBS's Palm Beach County location and acquiring its manufacturing equipment.

## COUNT 1
### Conspiracy
### (18 U.S.C. § 371)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From on or about August 28, 2012, through in or around August 2018, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**PHILLIP BRAUN, a/k/a "PJ,"**
**AARON SINGERMAN,**
**ROBERT DIMAGGIO,**
**ANTHONY VENTRELLA,**
**a/k/a "Joey,"**
**JAMES BOCCUZZI,**
**DAVID WINSAUER,**
**BLACKSTONE LABS, LLC, and**
**VENTECH LABS, LLC,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful functions of the United States Food and Drug Administration, an agency of the United States Department of Health and Human Services, in the United States Food and Drug Administration's oversight and regulation of food, drugs, and dietary supplements, in violation of Title 18, United States Code, Section 371, and to commit offenses against the United States, that is:

a.     to knowingly and with intent to  defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and

7

fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly cause to be delivered certain mail matter by the United States Postal Service and any private and commercial interstate carrier, according to the directions thereon, in violation of Title 18, United States Code, Section 1341; and

b.     to knowingly and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (1) using materially false and misleading statements to distribute products they claimed to be legal dietary supplements, but were in fact illegal to distribute and in some cases hazardous to consumers; and (2) distributing these illegal products without detection and regulatory oversight by the FDA.

### Manner and Means

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.     **PHILLIP BRAUN, AARON SINGERMAN,** and **ROBERT DIMAGGIO** established and incorporated **BLACKSTONE. BRAUN** and **SINGERMAN** falsely marketed the

8

company's products as cutting-edge dietary supplements, designed to safely promote muscle growth and strength, and enhance physical and mental performance.

5.      **PHILLIP BRAUN** and **AARON SINGERMAN** used **BLACKSTONE** to advertise illegal products on the internet and through email and social media, falsely telling customers that the company's products were legal and were dietary supplements.

6.      **ANTHONY VENTRELLA,** Unindicted Co-conspirator 1 and Unindicted Co-conspirator 2 ordered illegal and unsafe ingredients from China imported into the United States with false and fraudulent documentation, hiding the true contents from FDA and other departments and agencies of the United States Government.

7.      **PHILLIP BRAUN** and **AARON SINGERMAN** caused **BLACKSTONE** to evade FDA's regulatory authority and disregard requirements of the FDCA. Among other things, **BLACKSTONE** disregarded complaints from consumers who reported getting ill or injured from **BLACKSTONE's** products. **BLACKSTONE** failed to notify the FDA of such complaints, even when required by law.

8.      **PHILLIP BRAUN** and **AARON SINGERMAN** caused **BLACKSTONE's** advertisements to falsely claim: "All our products are manufactured in an FDA approved, registered and inspected facility that maintains GMP [Good Manufacturing Practices] certifications and follows all FDA guidelines." Moreover, **BLACKSTONE**'s advertisements falsely stated that: "Our pro-anabolic compounds are all third party independently lab tested before encapsulation."

9.      To shield themselves and **BLACKSTONE** from detection and scrutiny by FDA, **PHILLIP BRAUN** and **AARON SINGERMAN** established Fight Pharm and installed **ANTHONY VENTRELLA** as the company's public face.   **BRAUN** and **SINGERMAN**

9

transferred the distribution of various products from **BLACKSTONE** to Fight Pharm. Nevertheless, **BRAUN** and **SINGERMAN** maintained control of Fight Pharm, reaping its profits.

10.     To further conceal unlawful conduct, **PHILLIP BRAUN, AARON SINGERMAN, JAMES BOCCUZZI,** and **DAVID WINSAUER** created, and caused the creation of, fraudulent documents and records, and lied to customers.

11.     Conspirators distributed hundreds of thousands of bottles of illegal products nationwide and outside the United States, including the following products:

a.     designer steroids such as "Super DMZ RX 2.0," which contained dimethazine and methylstenbolone, and "Alpha-1 Max," which contained methyl-1-etiocholenolol;

b.     SARMs, such as "Ostapure," "Ostapro" and "PCT IV," all of which contained ostarine;

c.     stimulants, such as "Angel Dust," which contained 4-amino-2-methylpentane citrate, also known as "AMP Citrate;"

d.     nootropics, such as "Euphoria RX," which contained picamilon; and

e.     other products that violated the FDCA.

12.     To minimize public disclosures and FDA scrutiny concerning the sale of illegal products, **PHILLIP BRAUN, AARON SINGERMAN,** and **ANTHONY VENTRELLA** confidentially settled lawsuits, falsely promising to stop selling products that violated the FDCA. Nevertheless, **BRAUN, SINGERMAN, VENTRELLA, BLACKSTONE,** and Fight Pharm continued distributing illegal products through **BLACKSTONE**, Fight Pharm, and other entities.

10

13.     **PHILLIP BRAUN, AARON SINGERMAN, ANTHONY VENTRELLA** and their co-conspirators used the proceeds of the conspiracy for their own use, the use of others, and to further the conspiracy.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

1.     On or about August 28, 2012, **PHILLIP BRAUN, AARON SINGERMAN,** and **ROBERT DIMAGGIO** conferred by telephone and Skype and decided **BLACKSTONE** would register as a limited liability company and sell a product known as Super DMZ RX 2.0.

2.     On or about August 29, 2012, **PHILLIP BRAUN, AARON SINGERMAN**, and **ROBERT DIMAGGIO** caused **BLACKSTONE** to be in incorporated under the laws of Florida as a limited liability company.

3.     In or around August 2012, **BLACKSTONE, PHILLIP BRAUN, ROBERT DIMAGGIO**, and **AARON SINGERMAN** marketed and sold prohormones through the website, www.superdmz.com.

4.     In or around August 2012, **PHILLIP BRAUN, AARON SINGERMAN** and **ROBERT DIMAGGIO** used the website www.superdmz.com to sell Super DMZ Rx 2.0, falsely claiming that the product was a dietary supplement, and that the product was "100% legal!"

5.     On or about March 13, 2014, **ROBERT DIMAGGIO**, in an email to **AARON SINGERMAN** about FDA enforcement announcements concerning the designer steroid products Methadrol and Super DMZ RX 2.0, told **SINGERMAN** that "[o]nce you get an FDA letter I would

11

move all of the MDE and SDMZ that is left to a different location (in case they show up), and remove them from the website, and sell it to the retailers only [un]til its [sic] gone."

6.     On or about April 16, 2014, **AARON SINGERMAN, PHILLIP BRAUN, ANTHONY VENTRELLA**, and Unindicted Co-conspirator 2 caused Fight Pharm to be incorporated under the laws of Florida as a limited liability company.

7.     On or about April 18, 2014, **AARON SINGERMAN and ANTHONY VENTRELLA** signed a signature card for a Fight Pharm business checking account ending in 1697.

8.     On or about August 1, 2014, **BLACKSTONE, PHILLIP BRAUN and AARON SINGERMAN** caused a shipment of Super DMZ RX 2.0 to be sent from Palm Beach County, Florida to Unindicted Co-conspirator 3 in Arkansas.

9.     On or around September 17, 2014, **AARON SINGERMAN** provided **ANTHONY VENTRELLA** a draft message to be emailed to a Chinese supplier concerning the purchase of raw ingredients for Super DMZ RX 2.0.

10.     On or about September 26, 2014, **BLACKSTONE, PHILLIP BRAUN and AARON SINGERMAN** caused a shipment of Super DMZ RX 2.0 to be sent from Palm Beach County, Florida to Unindicted Co-conspirator 3 in Arkansas.

11.     On or about March 19, 2015, a **BLACKSTONE** employee forwarded to **AARON SINGERMAN** a customer's email seeking help because **BLACKSTONE's** product Angel Dust caused her stomach pain and vomiting that required emergency medical attention.

12.     On or about April 25, 2015, after **BLACKSTONE** received a Warning Letter from FDA stating that its Angel Dust product was illegal, **PHILLIP BRAUN and AARON**

**SINGERMAN** directed **BLACKSTONE** employees to sell all remaining **BLACKSTONE** Angel Dust as soon as possible.

13.     On or about May 19, 2015, **BLACKSTONE**, through an attorney, wrote to FDA concerning the Warning Letter FDA issued regarding Angel Dust and stated **BLACKSTONE** "has made the business decision to immediately cease the distribution and sale of its product, Angel Dust."

14.     On or about May 20, 2015, an associate of **PHILLIP BRAUN** and **AARON SINGERMAN** forwarded them an email from an online marketplace, which advised that the **BLACKSTONE** product named "Ostapure" had been removed from the online marketplace's product catalog because the product "has been identified as a prescription drug, a product imitating a prescription drug, an unapproved foreign drug or supplement, an unapproved new drug, or a controlled substance."

15.     On or about June 11, 2015, in response to a wholesale customer's email which said that **BLACKSTONE's** SARM products, including ostarine, were "pretty fucking illegal," **JAMES BOCCUZZI**, emailed and wrote, "Thanks for the info!"

16.     On or about June 24, 2015, **AARON SINGERMAN**, in an email to **DAVID WINSAUER** and **PHILLIP BRAUN**, said, "We didn't want any SARMS advertised in Mags . . . Our OSTAPURE ad in MD [Muscular Development magazine] may cause some problems now. Please never do that again.  You had 1/3 page for OSTAPURE in the most recent one and now someone who saw it might report us to FDA."

17.     On or about July 1, 2015, **ANTHONY VENTRELLA**, in a text message, told a **BLACKSTONE** employee that their raw ingredients were ordered from China, and instructed the **BLACKSTONE** employee to falsely state, "somewhere in the US if a client is asking."

13

18.    In or around August 2015, **PHILLIP BRAUN** and **AARON SINGERMAN** instructed **BLACKSTONE's** sales employees to sell Super DMZ RX 2.0 through Fight Pharm as a product called Methyl DMZ.

19.    On or about August 19, 2015, after receiving an email from the wife of an individual who reported serious health effects from Alpha 1 Max, **PHILLIP BRAUN** directed a **BLACKSTONE** employee in an email, "Don't reply to this scammer."

20.    On or about August 22, 2015, **PHILLIP BRAUN** emailed **AARON SINGERMAN** and asked, "I guess tell the people who want pros [prohormones] about Fight pharm [sic] right Aaron?"

21.    On or about August 31, 2015, **PHILLIP BRAUN** signed a signature card for a Fight Pharm business checking account ending in 1697.

22.    On or about September 4, 2015, **PHILLIP BRAUN** forwarded an email to **ANTHONY VENTRELLA**, providing information from an individual in China who was offering to sell SARM ingredients, including ostarine.

23.    On or about September 23, 2015, in response to an email from a customer asking why **BLACKSTONE** was removing SARMS from the company's web site, **JAMES BOCCUZZI** wrote, "Too much of a risk to sell fda is investigating."

24.    On or about September 24, 2015, in an email to Unindicted Co-conspirator 4, **AARON SINGERMAN**, **JAMES BOCCUZZI**, **DAVID WINSAUER**, and other **BLACKSTONE** employees, **PHILLIP BRAUN** wrote, "I don't even want SARMS in my warehouse . . . I am more nervous about this then [sic] I was about the Pro_hormones."

14

25.    On or about September 25, 2015, **ANTHONY VENTRELLA** emailed a pharmaceutical ingredient supplier in China, writing that he was "looking to purchase sarms and prohormones."

26.    On or about September 25, 2015, **JAMES BOCCUZZI** wrote an email to a **BLACKSTONE** customer about SARMs, and stated, "I will have them in a different brand for you. I had to get them off the [**BLACKSTONE**] label."

27.    On or about October 9, 2015, **PHILLIP BRAUN** answered an email from a customer about SARMs, including Ostapure, and said, "Illegal to sell them!"

28.    On or about October 9, 2015, **PHILLIP BRAUN** sent another email stating, "Sarms are under serious federal testing by medical companies. Osterine [sic] for instance is in level 2 testing meaning it's considered not safe for human consumption. To sell them as a dietary supplement would be illegal and comparable to putting something like heroin in bottles and selling it."

29.    On or about October 13, 2015, **JAMES BOCCUZZI** sent an email to **ANTHONY VENTRELLA,** Unindicted Co-conspirator 2 and **AARON SINGERMAN,** regarding a recent sale of Ostapure.  **BOCCUZZI's** email subject stated, "Payment for 1000 Ostapure to be entered through Fight Pharm."

30.    On or about October 27, 2015, **AARON SINGERMAN** emailed a **BLACKSTONE** salesperson about Fight Pharm, and directed the salesperson to falsely tell customers: "Just make SURE to explain that is NOT our company."

31.    On or about October 27, 2015, **PHILLIP BRAUN**, in an email to **AARON SINGERMAN** about Fight Pharm, wrote, "ITs [sic] very important people do not think we have anything to do with this!!"

15

32.     On or about November 6, 2015, **PHILLIP BRAUN**, **AARON SINGERMAN** and **ANTHONY VENTRELLA** caused VBS to be incorporated under the laws of Florida.

33.     On or about November 20, 2015, **PHILLIP BRAUN** texted "yes" to **DAVID WINSAUER** after being asked by **WINSAUER** whether an illegal dietary supplement product could be sold at a retail store that **BRAUN** and **SINGERMAN** controlled.

34.     On or about February 25, 2016, **ANTHONY VENTRELLA** sent a text message that notified an employee that an incoming package of powder of a raw ingredient to manufacture **BLACKSTONE** and **VENTECH** products was falsely labeled.

35.     On or about August 4, 2016, **JAMES BOCCUZZI**, sent an email to a wholesale customer and attached a document entitled "Certificate of Free Sale," which falsely described **BOCCUZZI** as an FDA employee. In the email, **BOCCUZZI** wrote, "This is the best I can do. I dont [sic] even feel comfortable doing this because I am impersonating the FDA and our business could get shut down, tons of people will lose their jobs."

36.     On or about January 28, 2017, **PHILLIP BRAUN**, in an email to a **BLACKSTONE** employee who was considering how to respond to a customer complaint, wrote, "I'm not worried about losing the customer. Im [sic] concerned with her making it public."

37.     On or about February 16, 2017, **ANTHONY VENTRELLA**, after being informed that a search warrant was being conducted by FDA at **VENTRELLA's** business, sent a text message to one of his employees that said, "Shit. If you can hide the pros [prohormones] please do."

38.     On or about February 16, 2017, during an interview with FDA special agents, **DAVID WINSAUER** falsely claimed that **BLACKSTONE** had stopped selling Super DMZ in December 2014.

16

39.     On or about February 16, 2017, during an interview with FDA special agents, **JAMES BOCCUZZI** falsely claimed that **BLACKSTONE** had stopped selling the Super DMZ almost two years previously.

40.     On or about August 30, 2018, after being notified by a customer that an FDA special agent wanted to speak to the customer about **BLACKSTONE, PHILLIP BRAUN** instructed the customer in an email, writing, "Ignore that."

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-3
### Introduction of Unapproved New Drugs into Interstate Commerce
### (21 U.S.C. §§ 331(d), 355(a), and 333(a)(2))

1.     Paragraphs 1-10 and 12-13 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates listed below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**BLACKSTONE LABS, LLC,**
**PHILIP BRAUN,**
**a/k/a "PJ," and**
**AARON SINGERMAN,**

with intent to defraud and mislead, did cause to be introduced and delivered for introduction into interstate commerce "Super DMZ RX 2.0," a new drug within the meaning of Title 21, United States Code, Section 321(p) that did not have in effect an approval of an application filed pursuant to Title 21, United States Code, Section 355(b) and 355(j), and was not exempted from such approval pursuant to Title 21, United States Code, Section 355(i), as charged in the individual counts below:

17

| Count | Approximate Date | Introduction into Interstate Commerce |
|-------|------------------|---------------------------------------|
| 2 | 08/1/2014 | 50 bottles of "Super DMZ RX 2.0" shipped from the Southern District of Florida to Arkansas |
| 3 | 09/26/2014 | 400 bottles of "Super DMZ RX 2.0" shipped from the Southern District of Florida to Arkansas |

In violation of Title 21, United States Code, Sections 331(d), 333(a)(2), and 355(a), and Title 18, United States Code, Section 2.

## COUNT 4
### Conspiracy to Distribute Controlled Substances
### (21 U.S.C. § 846)

1.     Paragraphs 10-13, 15-17 and 19-21 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     Steroids are synthetic variations of the male sex hormone testosterone, which is produced naturally in the human body.  Steroids can produce anabolic and androgenic effects. "Anabolic" effects relate to the increase and growth of muscle and bone mass.  "Androgenic" effects relate to the development of male reproductive organs and characteristics.  Anabolic steroids can be misused and cause harm to the body.  Misuse of anabolic steroids may lead to serious, even permanent, health problems, such as kidney failure, liver damage, high blood pressure, and increases in blood cholesterol.

3.     From on or about December 18, 2014, through in or around February 2017, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**PHILLIP BRAUN, a/k/a "PJ,"**
**AARON SINGERMAN,**
**ANTHONY VENTRELLA,**
**a/k/a "Joey,"**
**JAMES BOCCUZZI,**

18

**DAVID WINSAUER,**
**BLACKSTONE LABS, LLC, and**
**VENTECH LABS, LLC,**

did knowingly and willfully combine, conspire, confederate, and agree with each other, Unindicted Co-conspirator 2, Unindicted Co-conspirator 3, Unindicted Co-conspirator 4, and others, known and unknown to the Grand Jury, to manufacture, distribute, and possess with intent to manufacture and distribute Schedule III controlled substances, that is, the anabolic steroids trendione, halodrol, epistane, methylstenbolone, dimethazine, and methyl-1-etiocholenolol, as defined by Title 21, United States Code, Section 802(41)(A) and (C)(i)-(iii), in violation of Title 21, United States Code, Section 841(a)(1).

With respect to the defendants, **PHILLIP BRAUN, AARON SINGERMAN, ANTHONY VENTRELLA, JAMES BOCCUZZI, DAVID WINSAUER, BLACKSTONE LABS, LLC, VENTECH LABS, LLC,** and Unindicted Co-Conspirator 2, Unindicted Co-Conspirator 3, and Unindicted Co-Conspirator 4, the controlled substances involved in the conspiracy attributable to them as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to them, was a mixture and substance containing a detectable amount of trendione, halodrol, epistane, methylstenbolone, dimethazine, or methyl-1-etiocholenolol, Schedule III controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(E)(i).

It is further alleged pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i) that serious bodily injury resulted to C.H. from the use of methyl-1-etiocholenolol.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(E)(i).

19

## COUNT 5
### Distribution of a Controlled Substance
### (21 U.S.C. § 841(a)(1))

1.      Paragraphs 10, 12-13, and 15-17 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about June 30, 2015, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**PHILLIP BRAUN, a/k/a "PJ,"**
**AARON SINGERMAN,**
**ANTHONY VENTRELLA, a/k/a "Joey,"**
**JAMES BOCCUZZI,**
**DAVID WINSAUR, and**
**BLACKSTONE LABS, LLC,**

did knowingly and intentionally distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i) and (iii), it is further alleged that this violation involved 60,000 capsules of a mixture and substance containing a detectable amount of dimethazine and methylstenbolone, which were Schedule III controlled substances.

## COUNT 6
### Distribution of a Controlled Substance
### (21 U.S.C. § 841(a)(1))

1.      Paragraphs 10-12 and 15-17 of the General Allegations section of this Indictment are re-alleged and incorporate by reference as though fully set forth herein.

2.      On or about September 1, 2016, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

20

**PHILLIP BRAUN, a/k/a "PJ,"**
**ANTHONY VENTRELLA, a/k/a Joey,"**
**JAMES BOCCUZZI,**
**DAVID WINSAUER,**
**BLACKSTONE LABS, LLC, and**
**VENTECH LABS, LLC,**

did knowingly and intentionally distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i) and (iii), it is further alleged that this violation involved 30,000 capsules of a mixture and substance containing a detectable amount of dimethazine and methylstenbolone, which are Schedule III controlled substances.

### COUNT 7
#### Distribution of a Controlled Substance
#### (21 U.S.C. § 841(a)(1))

1.     Paragraphs 10 and 12 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about September 14, 2016, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**BLACKSTONE LABS, LLC, and**
**PHILLIP BRAUN,**

did knowingly and intentionally distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i) and (iii), it is further alleged that this violation involved a mixture and substance containing a detectable amount of dimethazine, a Schedule III controlled substance.

21

## COUNT 8
### Possession with Intent to Distribute a Controlled Substance
### (21 U.S.C. § 841(a)(1))

1.      Paragraphs 11 and 15 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about February 16, 2017, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**ANTHONY VENTRELLA, a/k/a "Joey," and
VENTECH LABS, LLC,**

did knowingly and intentionally possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

Pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i) and (iii), it is further alleged that this violation involved a mixture and substance containing a detectable amount of dimethazine, which is a Schedule III controlled substance.

## COUNTS 9-11
### Money Laundering
### (18 U.S.C. § 1957)

1.      Paragraphs 10 and 13 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth as to each count below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**AARON SINGERMAN,**

engaged and attempted to engage in a monetary transaction affecting interstate and foreign commerce by, through, and to a financial institution, in criminally derived property of a value

22

greater than $10,000, such property having been derived from specified unlawful activity and knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity.

| Count | Approximate Date | Monetary Transaction |
|-------|------------------|----------------------|
| 9 | 02/16/2015 | Transferred and exchanged check number 1371, made payable to Excell Auto Group in the amount of $218,117.38, from an account of **BLACKSTONE** at J.P. Morgan Chase Bank, N.A., account ending in 2830, for the purchase of a 2013 Rolls Royce |
| 10 | 06/19/2015 | Transferred and exchanged check number 1737, made payable to Nova Title in the amount of $190,790, from an account of **AARON SINGERMAN** at J.P. Morgan Chase Bank, N.A., account ending in 9542, for the purchase of a house in Palm Beach County |
| 11 | 08/26/2015 | Transferred and exchanged check number 1719, made payable to Boynton Beach Associates XXIV, LLLP in the amount of $259,634, from an account of **AARON SINGERMAN** at J.P. Morgan Chase Bank, N.A., account ending in 9542, for the purchase of a house in Palm Beach County |

It is further alleged that the specified unlawful activity is conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 371.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

### COUNTS 12-14
**Money Laundering**
**(18 U.S.C. § 1957)**

1.      Paragraphs 10 and 12 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

23

2.      On or about the dates set forth as to each count below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**PHILLIP BRAUN, a/k/a "PJ,"**

engaged and attempted to engage in a monetary transaction affecting interstate and foreign commerce by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity and knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity.

| Count | Approximate Date | Monetary Transaction |
|-------|------------------|----------------------|
| 12 | 03/04/2015 | Wire transfer of $43,000 from an account of **PHILLIP BRAUN** at J.P. Morgan Chase Bank, N.A., account ending in 8539, to a Bank of America trust account of an attorney in Palm Beach County, account ending in 8202, for the purchase of a house at 284 NE 7th Street, Boca Raton, Florida |
| 13 | 05/23/2015 | Transferred and exchanged check number 1515, made payable to Excell Auto Group Inc. in the amount of $111,998.38, from an account of **BLACKSTONE** at J.P. Morgan Chase Bank, N.A., account ending in 2830, for the purchase of a 2012 Mercedes |
| 14 | 06/17/2015 | Wire transfer of $327,410.81 from an account of **PHILLIP BRAUN** at J.P. Morgan Chase Bank, N.A., account ending in 8539, to a Bank of America trust account of an attorney in Palm Beach County, account ending in 8202, to complete the purchase of a house located at 284 NE 7th Street, Boca Raton, Florida |

It is further alleged that the specified unlawful activity is conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 371.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

### FORFEITURE
**(18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 21 U.S.C. § 853(a)(1)-(2))**

1.     The allegations of this Indictment are re-alleged and fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which **PHILLIP BRAUN, AARON SINGERMAN, ROBERT DIMAGGIO, ANTHONY VENTRELLA, JAMES BOCCUZZI, DAVID WINSAUER, BLACKSTONE LABS, LLC,** and **VENTECH LABS, LLC** have an interest.

2.     Upon conviction of a conspiracy to violate Title 18, United States Code, Section 1341 or Section 1343, as alleged in this Indictment, any defendant so convicted shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

3.     Upon conviction of a violation of Title 21, United States Code, Section 331, Section 333, or Section 355, as alleged in this Indictment, any defendant so convicted shall forfeit to the United States any unapproved new drug, pursuant to Title 21, United States Code, Section 334(a)(1).

4.     Upon conviction of a violation of, or a conspiracy to violate, Title 21, United States Code, Section 841, as alleged this Indictment, any defendant so convicted shall forfeit to the United States of America, pursuant to Title 21, United States Code, Section 853(a)(1)-(2), any property constituting, or derived from, any proceeds the convicted defendant obtained, directly or indirectly, as a result of such violation, and any of the convicted defendant's property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violation.

5. Upon conviction of a violation of Title 18, United States Code, Section 1957, as alleged in this Indictment, any defendant so convicted shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

6. The property that is subject to forfeiture includes, but is not limited to, the following:

Real Property:

a) The real property known and numbered as 284 NE 7th Street, Boca Raton, Florida, together with all improvements, appurtenances, attachments, and fixtures thereon and therein;

b) The real property known and numbered as 16598 Fleur de Lis Way, Delray Beach, Palm Beach County, together with all improvements, appurtenances, attachments, and fixtures thereon and therein;

Bank Accounts:

Certified funds in the amount of $223,430.40 (US) made payable by JP Morgan Chase Bank, N.A. to the United States Marshals Service by cashier's check number 4555916142, dated March 6, 2017, which were seized pursuant to a warrant from account number 117352830 held at JP Morgan Chase Bank, N.A., in the name of Blackstone Labs, LLC;

Automobiles:

One (1) 2012 Mercedes (VIN number WDDRK7HAXCA008764);

26

Business equipment: The business equipment located at 1140 Holland Drive, Suite 12, Boca Raton, Florida, which includes the following:

a)    PER-FIL Micro-C Single Head Automatic Auger Filler;

b)    CVC-EC30 Wrap Labeler;

c)    C60 Hot Stamp Printer/Coder;

d)    Titan Pharmaceutical – Fully Automatic Encapsulation Machine;

e)    Titan Pharmaceutical – V-Mixer model TVM-1000;

f)    ProFiller 3700 capsule-filling system;

g)    ProFiller 3700 capsule-filling system;

h)    Semi-Auto Capsule Filler Model DJS-8; and

i)    Electronic Channel Counter (12-track).

Forfeiture Money Judgment(s): A sum of money equal in value to the following, for which the United States will seek entry as a forfeiture money judgment against a convicted defendant as part of that defendant's sentence in this case:

a)    Any property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy to violate Title 18, United States Code, Section 1341 or Section 1343, as alleged in this Indictment;

b)    Any property constituting, or derived from, any proceeds a convicted defendant obtained, directly or indirectly, as a result of a violation of, or a conspiracy to violate, Title 21, United States Code, Section 841, as alleged this Indictment, and any of the convicted defendant's property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violation; and

c)    The property, real or personal, that was involved in a violation Title 18,

27

United States Code, Section 1957, as alleged in this Indictment, or any property traceable to such property.

All pursuant to Title 18, United States Code, Sections 981, and Title 21, United States Code, Section 334(a)(1), as made applicable by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982, and Title 21, United States Code, Section 853.

A TRUE BILL

FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

GUSTAV W. EYLER
ACTING DIRECTOR
U. S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

ALISTAIR READER, TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

DAVID A. FRANK, TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

PHILLIP BRAUN, et al.,

Defendant.

_____ /

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

| | | |
|---|---|---|
| New Defendant(s) | Yes ____ | No ____ |
| Number of New Defendants | | |
| Total number of counts | | |

**Court Division:** (Select One)

____ Miami      ____ Key West
____ FTL      _X_ WPB      ___ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:      (Yes or No)      NO____
   List language and/or dialect      _____

4. This case will take      20      days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   | | | | | (Check only one) | |
   |---|---|---|---|---|---|
   | I | 0  to 5 days | | | Petty | |
   | II | 6  to 10 days | | | Minor | |
   | III | 11  to 20 days | _X_ | | Misdem. | |
   | IV | 21 to 60 days | | | Felony | _X_ |
   | V | 61 days and over | | | | |

6. Has this case been previously filed in this District Court? (Yes or No)      No
   If yes:
   Judge:                              Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?      (Yes or No)      No
   If yes:
   Magistrate Case No.
   Related Miscellaneous numbers:      17-MJ-2116; 17-MJ-6071; 17-MJ-8047; 17-MJ-8048; 17-MJ-6319
                                        18-MJ-6385; 18-cv-81352-Marra
   Defendant(s) in federal custody as of      _____
   Defendant(s) in state custody as of      _____
   Rule 20 from the District of      _____
   Is this a potential death penalty case? (Yes or No)      No

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?      Yes ____      No X____

_____
ALISTAIR READER
DOJ TRIAL ATTORNEY
Court ID No. A5502357

*Penalty Sheet(s) attached

REV 5/3/17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

**Defendant's Name:**    **PHILLIP BRAUN, a/k/a "PJ"**

**Case No:** _____

Count #:   1

  Conspiracy to Defraud the United States and to Commit Federal Offenses

  Title 18, United States Code, Section 371

**\*Max Penalty**:   Five (5) years' imprisonment

Counts #:   2, 3

  Introduction of Unapproved New Drugs Into Interstate Commerce

  Title 21, United States Code, Sections 331(d), 355(a), and 333(a)(2)

**\*Max Penalty**:   Three (3) years' imprisonment as to each count

Count #:   4

  Conspiracy to Distribute Controlled Substances

  Title 21, United States Code, Section 846

**\*Max Penalty:**   Fifteen (15) years' imprisonment

Counts #:   5, 6, 7

  Distribution of a Controlled Substance

  Title 21, United States Code, Section 841(a)(1)

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   PHILLIP BRAUN, a/k/a "PJ"

**Case No:** _____

Counts #:   12, 13, 14

Money Laundering

Title 18, United States Code, Section 1957(a)

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**     **AARON SINGERMAN**

**Case No:** _____

Count #:    1

  Conspiracy to Defraud the United States and to Commit Federal Offenses

  Title 18, United States Code, Section 371

**\*Max Penalty**:    Five (5) years' imprisonment

Counts #:    2, 3

  Introduction of Unapproved New Drugs Into Interstate Commerce

  Title 21, United States Code, Sections 331(d), 355(a), and 333(a)(2)

**\*Max Penalty**:     Three (3) years' imprisonment as to each count

Count #:    4

  Conspiracy to Distribute Controlled Substances

  Title 21, United States Code, Section 846

\*Max Penalty:     Fifteen (15) years' imprisonment

Counts #:    5

  Distribution of a Controlled Substance

  Title 21, United States Code, Section 841(a)(1)

\*Max Penalty:     Ten (10) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

**Defendant's Name:**  **AARON SINGERMAN**

**Case No:** _____

Counts #:   9, 10, 11

 Money Laundering

  Title 18, United States Code, Section 1957(a)

**\*Max Penalty**:   Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**     **ANTHONY VENTRELLA, a/k/a "Joey"**

**Case No:** _____

Count #:    1

   Conspiracy to Defraud the United States and to Commit Federal Offenses

   Title 18, United States Code, Section 371

**\*Max Penalty:**    Five (5) years' imprisonment

Count #:     4

   Conspiracy to Distribute Controlled Substances

   Title 21, United States Code, Section 846

\*Max Penalty:     Fifteen (15) years' imprisonment

Counts #:    5, 6

   Distribution of a Controlled Substance

   Title 21, United States Code, Section 841(a)(1)

\*Max Penalty:     Ten (10) years' imprisonment as to each count

Count #:    8

   Possession With Intent to Distribute a Controlled Substances

   Title 21, United States Code, Section 841(a)(1)

**\*Max Penalty:**    Ten (10) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**     **JAMES BOCCUZZI**

**Case No:** _____

Count #:   1

  Conspiracy to Defraud the United States and to Commit Federal Offenses

  Title 18, United States Code, Section 371

**\*Max Penalty**:   Five (5) years' imprisonment

Count #:   4

  Conspiracy to Distribute Controlled Substances

  Title 21, United States Code, Section 846

\*Max Penalty:   Fifteen (15) years' imprisonment

Counts #:   5, 6

  Distribution of a Controlled Substance

  Title 21, United States Code, Section 846

\*Max Penalty:   Fifteen (15) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   **DAVID WINSAUER**

**Case No:**

Count #:   1

 Conspiracy to Defraud the United States and to Commit Federal Offenses

 Title 18, United States Code, Section 371

**\*Max Penalty**:   Five (5) years' imprisonment

Count #:   4

 Conspiracy to Distribute Controlled Substances

 Title 21, United States Code, Section 846

\*Max Penalty:   Fifteen (15) years' imprisonment

Count #:   5, 6

 Distribution of a Controlled Substance

 Title 21, United States Code, Section 846(a)(1)

\*Max Penalty:   Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **ROBERT DIMAGGIO** _____

**Case No:** _____

Count #:   1

  Conspiracy to Defraud the United States and to Commit Federal Offenses _____

  Title 18, United States Code, Section 371 _____

**\*Max Penalty**:   Five (5) years' imprisonment _____

Count #:

_____

_____

**\*Max Penalty**: _____

Count #:

_____

_____

\*Max Penalty: _____

Count #:

_____

_____

\*Max Penalty: _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**     **BLACKSTONE LABS, LLC**

**Case No:**

Count #:   1

  Conspiracy to Defraud the United States and to Commit Federal Offenses

  Title 18, United States Code, Section 371

**\*Max Penalty**:    Five (5) years' imprisonment

Counts #:   2, 3

  Introduction of Unapproved New Drugs Into Interstate Commerce

  Title 21, United States Code, Sections 331(d), 355(a), and 333(a)(2)

**\*Max Penalty**:    Three (3) years' imprisonment as to each count

Count #:   4

  Conspiracy to Distribute Controlled Substances

  Title 21, United States Code, Section 846

\*Max Penalty:    Fifteen (15) years' imprisonment

Counts #:   5, 6, 7

  Distribution of a Controlled Substance

  Title 21, United States Code, Section 841(a)(1)

\*Max Penalty:    Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**<u>PENALTY SHEET</u>**

Defendant's Name:      **VENTECH LABS, LLC**

Case No: _____

Count #:    1

  Conspiracy to Defraud the United States and to Commit Federal Offenses

  Title 18, United States Code, Section 371

**<u>\*Max Penalty</u>**:    Five (5) years' imprisonment

Count #:    4

  Conspiracy to Distribute Controlled Substances

  Title 21, United States Code, Section 846

\*Max Penalty:      Fifteen (15) years' imprisonment

Counts #:   6, 8

  Distribution of a Controlled Substance

  Title 21, United States Code, Section 841(a)(1)

\*Max Penalty:      Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

**EXHIBIT D**

# BURSOR & FISHER

P.A.

888 SEVENTH AVENUE
NEW YORK, NY 10019
www.bursor.com

YITZCHAK KOPEL
Tel: 646.837.7127
Fax: 212.989.9163
ykopel@bursor.com

March 20, 2020

*Via Certified Mail - Return Receipt Requested*

Blackstone Labs, LLC
1120 Holland Dr. Suite 15
Boca Raton, FL  33847

Athlete's Nutrition
3668 Adobe Rd. Suite F
Twentynine Palms, CA  92277

Re:     *Demand Letter Pursuant to Cal Civ Code § 1782; violation of the U.C.C. §§ 2-314; Cal
        Health & Saf Code § 110620; Cal Bus & Prof Code §§ 17200, 17500, et seq; Cal Civ
        Code §§ 1750, et seq; Fraud, Breach of Implied Warranty; and all other applicable laws*

To Whom It May Concern,

This letter serves as a preliminary notice and demand for corrective action by Blackstone Labs, LLC ("Defendant," "Blackstone" or "You") arising from violations of consumer protection laws on behalf of our client, Edward Quidera, and a class of all similarly situated purchasers of Your Dust X product, as well as all other products containing the stimulant known as 2-aminoisoheptane ("DMHA[1]").  This letter also serves as notice pursuant to U.C.C. § 2-607(3)(a) concerning the breaches of implied warranties described herein, and notice regarding Your violations of all applicable consumer protection laws, including, but not limited to, California Business & Professions Code §§ 17200 & 17500, et seq, and California Civil Code §§ 1750, *et seq.*

You have participated in the manufacture, marketing, and sale of Dust X and Arson Fat Burner,  containing the ingredient DMHA (collectively, "Supplements").  The above-referenced Supplements have been marketed and sold as part of fat-burning supplements or pre-workout formulations.  However, the FDA has explained that use of DMHA in supplements is illegal.[2]

Published academic literature has confirmed the findings of the FDA, namely concluding that the "uncontrolled use of [DMHA], its physiological and psychoactive effects raise serious health implications with possible impact on athletes and doping practices."[3]  DMHA has been associated with side effects such as "mood swings, tremor, concentration deficiency, over-

---

[1] DMHA is known by various names, including Octodrine.  The term DMHA as used herein is designed to refer to DMHA collectively under its various names.
[2] https://www.fda.gov/food/dietary-supplement-products-ingredients/dmha-dietary-supplements
[3] Catalani, Valeria et al. "Octodrine: New Questions and Challenges in Sport Supplements." *Brain sciences* vol. 8,2 34. 20 Feb. 2018, doi:10.3390/brainsci8020034

stimulation, energy crashes, anxiety, high blood pressure, dyspnoea, rapid heartbeat and heartburn."[4]

DMHA has also been banned by most major associations in the United States and abroad, including the NCAA, United States/World Anti-Doping Agency, and the Department of Defense.

Additionally, the state of California adopts new federal food regulations 30 days after any federal regulation takes effect pursuant to California Health & Safety Code § 110115. Finally, according to California Health & Safety Code § 110620, it is unlawful to sell any adulterated food, which is defined by California Health & Safety Code § 110545 as any food that "bears or contains any poisonous or deleterious substance that may render it injurious to [the] health of man." Taken together these statutes mean that it unlawful to sell goods that are banned by FDA regulations in the state of California.

Mr. Quidera purchased Dust X containing the unlawful ingredient DMHA. Had he known the truth about Dust X, he would not have purchased or used the product

By selling adulterated and illegal supplements to our client and others similarly situated, You breached implied warranties made to consumers. *See* U.C.C. § 2-313. You failed to inform consumers of the true nature of, and danger associated with, DMHA.

Defendant's conduct is also a deceptive business practice under all applicable consumer protection laws, including, but not limited to, California Business & Professions Code §§ 17200 & 17500, *et seq*., and California Civil Code §§ 1750, *et seq*.

Our client is acting on behalf of a class defined as all persons in the United States who purchased and used the Supplements and a subclass of all persons in California who purchased and used the Supplements.

To cure these defects, we demand that you (1) cease and desist from further sales of the illegal Supplements; (2) issue an immediate recall of the Supplements; and (3) make full restitution to all purchasers of the Supplements.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.   All documents concerning the design, development, supply, production, extraction, and/or testing of the Supplements;

2.   All documents concerning the advertisement, marketing, or sale of the Supplements;

3.   All documents concerning communications with any retailer involved in the marketing or sale of the Supplements;

---

[4] *Id.*

BURSOR&FISHER
P.A.

4.     All documents concerning communications with purchasers of the Supplements;

5.     All adverse event reports or consumer complaints regarding the Supplements;

6.     All documents concerning communications with federal or state regulators; and

7.     All documents concerning the total revenue derived from sales of the Supplements in the United States.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

This letter also serves as a thirty (30) day notice and demand under California Civil Code § 1782 for damages. Accordingly, should you fail to rectify the situation on a class-wide basis within 30 days of receipt of this letter, we will seek actual damages, plus punitive damages, interest, attorneys' fees and costs.

We are willing to negotiate to attempt to resolve the demands asserted in this letter. If you wish to enter into such discussions, please contact me right away. If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

Very truly yours,

Yitzchak Kopel

**EXHIBIT E**

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Sarah N. Westcot, declare as follows:

1.       I am an attorney at law licensed to practice in the State of Florida and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.       The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) because Defendant's principal place of business in this District.

I declare under the penalty of perjury under the laws of the State of Florida and the United States that the foregoing is true and correct and that this declaration was executed at Miami, Florida this 3rd day of June 2020.


_____*/s/ Sarah N. Westcot*_____
           Sarah N. Westcot